ORIGINAL

1  Joseph J. Tabacco, Jr. (SBN 75484)
   Daniel E. Barenbaum (SBN 209261)
2  Anthony D. Phillips (SBN 259688)
   **BERMAN DEVALERIO**
3  One California Street, Suite 900
   San Francisco, CA 94111
4  Telephone: (415) 433-3200
   Facsimile: (415) 433-6282
5  jtabacco@bermandevalerio.com
   dbarenbaum@bermandevalerio.com
6  aphillips@bermandevalerio.com

7  *Attorneys for Plaintiff*

8  [Additional Counsel Appear on Signature Page]

**FILED**

NOV - 7 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*E-filing*

*RS*

9  **UNITED STATES DISTRICT COURT**

10  **NORTHERN DISTRICT OF CALIFORNIA**

11  RICHARD MITCHEM, Individually and
    On Behalf of All Others Similarly Situated,

12                          Plaintiff,

13          v,

14  DIAMOND FOODS, INC., MICHAEL J.
    MENDES and STEVEN M. NEIL,

15                          Defendants.

16

Case No. **CV 11 5399**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

17

18      Plaintiff Richard Mitchem ("Plaintiff"), individually and on behalf of all other persons
19  similarly situated, by his undersigned attorneys, for his Class Action Complaint against
20  Defendants, alleges upon personal knowledge as to himself and his own acts, and upon
21  information and belief as to all other matters, based on, *inter alia*, the investigation conducted
22  by and through his attorneys, which included, among other things: a review of the defendants'
23  public documents; conference calls and announcements made by Defendants; Securities and
24  Exchange Commission ("SEC") filings; wire and press releases published by and regarding
25  Diamond Foods, Inc. ("Diamond" or the "Company"); securities analysts' reports and
26  advisories about the Company; and information readily obtainable on the Internet. Plaintiff
27  believes that substantial additional evidentiary support will exist for the allegations set forth
28  herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

2   1.   This is a securities fraud class action on behalf of all persons or entities who
3   purchased or otherwise acquired the securities of Diamond during the period from December 9,
4   2010 through and including November 4, 2011 (the "Class Period"), seeking to pursue remedies
5   under the Securities Exchange Act of 1934 (the "Exchange Act"). This class action is brought
6   under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); and SEC
7   Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

8   2.   Throughout the Class Period, Defendants made false and/or misleading
9   statements, as well as failed to disclose material adverse facts about the Company's business,
10  operations, and prospects. Specifically, Defendants made false and/or misleading statements
11  and/or failed to disclose: (1) the Company overstated its earnings by improperly accounting for
12  certain crop payments to walnut growers; (2) the Company's acquisition of Pringles snack
13  business would be delayed; (3) that the Company lacked adequate internal and financial
14  controls; and (4) that, as a result of the foregoing, the Company's financial results were
15  materially false and misleading at all relevant times.

16  3.   On November 1, 2011, after the market closed, the Company disclosed that the
17  Chairman of the Audit Committee received an external communication "regarding" Diamond's
18  accounting for certain crop payments to walnut growers, which the Company's Audit
19  Committee is now investigating. As a result, the Company is delaying the acquisition of the
20  Pringles snack business from The Procter & Gamble Company ("P&G") for at least six months.

21  4.   On this news, Diamond shares declined $11.33 per share, or more than 17.6%, to
22  close at $52.79 per share on November 2, 2011.

23  5.   On November 3, 2011, *The Wall Street Journal* reported, among other things,
24  that the "investigation centers around the timing of a recent payment to walnut growers for their
25  2011 crop" and that at least one of the improper payments is estimated at $50 million.

26  6.   On this news, Diamond shares declined an additional $6.39 per share or 12% in
27  two consecutive trading sessions, to close at $46.40 per share on November 4, 2011.

28

1      7.      On November 5, 2011, *Barron's* published an article stating, among other things,

2 that had the Company "properly booked costs for fiscal 2011... it would've earned as little as

3 $1.14 a share," instead of the reported earnings for the fiscal year ended July 2011 of $2.61 per

4 share, before noncash charges and expenses.

5      8.      On this news, the stock fell an additional $7.31 per share or nearly 16%, to close

6 at $39.09 per share on November 7, 2011.

7      9.      As a result of Defendants' wrongful acts and omissions, and the precipitous

8 declines in the market value of the Company's securities, Plaintiff and other Class members

9 have suffered significant losses and damages.

10 

**JURISDICTION AND VENUE**

11      10.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

12 Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC,

13 17 C.F.R. § 240.10b-5.

14      11.      This Court has jurisdiction over the subject matter of this action pursuant to

15 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16      12.      Venue is proper in this District pursuant to Section 27 of the Exchange Act,

17 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein,

18 including the preparation and dissemination of materially false and misleading information,

19 occurred in substantial part in this District.

20      13.      In connection with the challenged conduct, Defendants, directly or indirectly,

21 used the means and instrumentalities of interstate commerce, including, but not limited to, the

22 United States mails, interstate telephone communications and the facilities of the national

23 securities markets.

24 

**PARTIES**

25      14.      Plaintiff Richard Mitchem, as set forth in the accompanying certification,

26 incorporated by reference herein, purchased Diamond securities during the Class Period, and

27 suffered damages as a result of the federal securities law violations and false and/or misleading

28 statements and/or material omissions alleged herein.

CLASS ACTION COMPLAINT      3

1    15.    Defendant Diamond is a Delaware corporation with its principal executive
2  offices located at 600 Montgomery Street, 17th Floor, San Francisco, CA 94111-2702.
3  Diamond is a branded food company specializing in processing, marketing and distributing
4  culinary, snack, in-shell and ingredient nuts. The aggregate number of shares of Diamond
5  securities outstanding as of August 31, 2011 is approximately 22 million shares. Diamond
6  common stock is listed on the NASDAQ Global Select Market ("NASDAQ") under the ticker
7  "DMND."

8    16.    Defendant Michael J. Mendes ("Mendes") was, at all relevant times, the
9  Company's Chairman, President and Chief Executive Officer.

10    17.    Defendant Steven M. Neil ("Neil") was, at all relevant times, the Company's
11  Executive Vice President, Chief Financial Officer and Chief Administrative Officer.

12    18.    The defendants referenced above in ¶¶ 16 and 17 are collectively referred to
13  herein as the "Individual Defendants."

14                  **SUBSTANTIVE ALLEGATIONS**

15    **Background**

16    19.    Diamond is a high-growth innovative packaged food company focused on
17  building, acquiring and energizing brands, including Kettle Chips, Emerald snack nuts, Pop
18  Secret popcorn, and Diamond of California snack and culinary nuts. Diamond's products are
19  distributed globally in stores where snacks and culinary nuts are sold.

20    **Defendants' False and Misleading Statements**

21    20.    On December 8, 2010, after the market closed, the Company announced
22  financial results for the first fiscal quarter ended October 31, 2010. For the first quarter, the
23  Company reported a net income of $14.2 million, or $0.64 diluted earnings per share ("EPS")
24  and revenue of $252.57 million, as compared to a net income of $14.9 million, or $0.88 diluted
25  EPS and revenue of $180.64 million for the same period of the prior year.

26    21.    On December 8, 2010, the Company filed with the SEC its quarterly report on
27  Form 10-Q for the first fiscal quarter ended October 31, 2010, which was signed by Defendant
28  Neil, and which represented the Company's financial results and financial position. In addition,

1    pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-Q contained signed

2    certifications by Defendants Mendes and Neil, stating that the financial information contained in

3    the 10-Q was accurate, and that they disclosed any material changes to the Company's internal

4    control over financial reporting.

5    22.    On March 8, 2011, the Company announced financial results for the second

6    fiscal quarter ended January 31, 2011. For the second fiscal quarter, the Company reported a

7    net income of $19.7 million, or $0.87 diluted EPS and revenue of $257.59 million, as compared

8    to a net income of $8.8 million, or $0.52 diluted EPS and revenue of $184.17 million for the

9    same period of the prior year.

10    23.    On March 8, 2011, the Company filed with the SEC its quarterly report on Form

11    10-Q for the second fiscal quarter ended January 31, 2011, which was signed by Defendant

12    Neil, and which represented the Company's financial results and financial position. In addition,

13    pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Mendes and

14    Neil, stating that the financial information contained in the 10-Q was accurate, and that they

15    disclosed any material changes to the Company's internal control over financial reporting.

16    24.    On April 5, 2011, Diamond announced in a press release the signing of a

17    definitive agreement with P&G to purchase the Pringles snack business from P&G for $2.35

18    billion, with the transaction to be completed by the end of calendar 2011. Moreover, the press

19    release represented the following:

20

**Financial Benefit for Diamond Foods Shareholders**

21

22

Assuming Pringles had been owned for all of fiscal year 2011, the combined company would be expected to deliver the following estimated financial results on a pro forma basis for fiscal year 2011:

23

24

- Net sales of approximately $2.4 billion;
- Double-digit accretion to earnings per share (EPS), excluding merger and integration costs;

25

26

- Estimated earnings before interest, taxes, depreciation and amortization (EBITDA), including $25 million in synergies, of approximately $398 million to $410 million.

27

28

For fiscal year 2012, Diamond anticipates strong growth in its core business with EPS of $2.85 to $2.98 per share on a standalone basis, an increase of 15 percent to 20 percent from the midpoint of its fiscal 2011 guidance range, which represents a 30 percent increase over 2010 EPS.

CLASS ACTION COMPLAINT                            5

Combined results for Diamond plus the Pringles business for fiscal year 2012 will depend on the actual closing date of the transaction. Assuming the transaction closes by the end of calendar 2011, seven months of Pringles performance would be included in the following expected results:

- Fiscal 2012 total net sales are estimated to be approximately $1.8 billion;

- Fiscal 2012 EPS, before costs associated with the transaction and integration, are estimated to range from $3.00 to $3.10 per share, which reflects EPS accretion of 12 to 15 cents per share

The transaction is expected to significantly increase cash flow and accelerate the de-levering of Diamond's balance sheet. Pro forma leverage at closing is projected to be below four times EBITDA, and projected to drop below three times at the end of fiscal 2013. Cash flow after brand investments and capital expenditures is expected to approach $200 million in the first full fiscal year after closing the merger.

* * *

The value of the transaction is $2.35 billion, comprising $1.5 billion in Diamond common stock, consisting of 29.1 million shares for approximately 57 percent of the outstanding shares of the combined company, and the assumption of $850 million of Pringles debt. Diamond's existing shareholders would continue to own approximately 43 percent of the combined company.

The parties have also agreed to a collar mechanism that would adjust the amount of debt assumed by Diamond based upon Diamond's stock price during a trading period prior to the commencement of the Exchange Offer. The amount of debt to be assumed by Diamond could increase by up to $200 million or decrease by up to $150 million based on this adjustment mechanism.

Diamond expects to incur one-time costs of approximately $100 million related to the transaction over the next two years. P&G also will provide Diamond transition services for up to 12 months after closing.

25. On June 2, 2011, the Company announced financial results for the third fiscal quarter ended April 30, 2011. For the third fiscal quarter, the Company reported a net income of $7.7 million, or $0.34 diluted EPS and revenue of $223 million, as compared to a net loss of $4.3 million, or ($0.22) diluted EPS and revenue of $138.7 million for the same period of the prior year.

26. On June 2, 2011, the Company filed with the SEC its quarterly report on Form 10-Q for the third fiscal quarter ended April 30, 2011, which was signed by Defendant Neil, and which represented the Company's financial results and financial position. In addition, pursuant

1 to SOX, the Form 10-Q contained signed certifications by Defendants Mendes and Neil, stating

2 that the financial information contained in the 10-Q was accurate, and that they disclosed any

3 material changes to the Company's internal control over financial reporting.

4     27.    On September 15, 2011, the Company announced financial results for the fourth

5 fiscal quarter and fiscal year ended July 31, 2011. For the fourth fiscal quarter, the Company

6 reported a net income of $8.5 million, or $0.37 diluted EPS and net sales of $233 million, as

7 compared to a net income of $6.7 million, or $0.30 diluted EPS and net sales of $176.6 million

8 for the same period of the prior year. For the fiscal year, the Company reported a net income of

9 $50 million, or $2.22 diluted EPS and net sales of $965.9 million, as compared to a net income

10 of $26 million or $1.36 diluted EPS and net sales of $680 million for the same period of the

11 prior year.

12     28.    On September 15, 2011, the Company filed its annual report on Form 10-K for

13 the fourth fiscal quarter and fiscal year ended July 31, 2011 with the SEC, which was signed by,

14 among others, Defendants and Mendes and Neil, and represented the Company's financial

15 results and financial position. In addition, pursuant to SOX, the Form 10-K contained signed

16 certifications by Defendants Mendes and Neil, stating that the financial information contained in

17 the 10-K was accurate, and that they disclosed any material changes to the Company's internal

18 control over financial reporting.

19     29.    The statements referenced above in ¶¶ 20-28 above were materially false and/or

20 misleading because they misrepresented and failed to disclose the following adverse facts,

21 which were known to Defendants or recklessly disregarded by them that: (1) the Company

22 overstated its earnings by improperly accounting for certain crop payments to walnut growers;

23 (2) the Company's acquisition of Pringles snack business would be delayed; (3) the Company

24 lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the

25 Company's financial results were materially false and misleading at all relevant times.

26     **The Truth Emerges**

27     30.    On November 1, 2011, after the market closed, the Company disclosed the

28 following:

CLASS ACTION COMPLAINT                7

> Diamond Foods, Inc. (Nasdaq:DMND) today announced that its previously announced acquisition of the Pringles snack business from The Procter & Gamble Company ("P&G") is now expected to close in the first half of calendar 2012. Diamond and P&G had previously expected the closing to occur in December of 2011.

> Diamond and P&G have revised the expected closing date of the acquisition following the receipt by the Chairman of the Audit Committee of Diamond's Board of Directors of an external communication regarding Diamond's accounting for certain crop payments to walnut growers. In response to the communication, Diamond's Audit Committee decided to perform an investigation of this matter. Management is fully committed to supporting the Audit Committee in this process.

31. Immediately, at least three analysts downgraded the stock in the wake of the disclosures. Indeed, Ed Aaron, an analyst at RBC Capital Markets noted that "[f]rom our perspective, the onus now lies on Diamond to prove there have been no irregularities." Similarly, Mitchell B. Pinheiro, an analyst from Janney Capital Markets believes that the investigation "creates both deal risk and the potential for higher debt levels."

32. On this news, Diamond shares plummeted $11.33 per share, or more than 17.6%, to close at $52.79 per share on November 2, 2011.

33. On November 3, 2011, *The Wall Street Journal* ("WSJ") reported that the "investigation centers around the timing of a recent payment to walnut growers for their 2011 crop, which currently is being harvested." The article further reported the following in relevant part:

> Under the long-term contracts Diamond uses to buy walnuts, the company takes delivery in the fall and then decides the following year what to pay growers—potentially not until the July 31 end of its fiscal year, according to the company's securities filings.

> In between, the company reports estimated prices in its financial statements. The company warns that those estimates can change significantly.

> On Sept. 2, Diamond made what it called a "momentum" payment to growers, who said it arrived just after they received their final payment for their 2010 crop as usual in August.

> The company told growers in a terse letter in late August that the momentum payment was an advance on the 2011 crop yet to be delivered. But growers said they didn't recall receiving that sort of payment in past years. Some analysts and growers speculated that the timing of the payment—more than 30 days after the close of the 2011 fiscal year—was meant to make that year's costs appear lower than they actually were.

"We believe the basis of the investigation is whether the momentum payment was properly accounted for," RBC Capital analyst Ed Aaron said in a report.

The company has said the payment is accounted for in its fiscal 2012 cost of goods sold and reflected in its earnings forecast for the year.

In prior years, analysts say, Diamond has sent growers one lump sum in August covering the final payment for the previous year and a momentum payment for the coming year. The company wouldn't say if that was the case or why it decided to separate the payments this year.

\* \* \*

Diamond is using its stock to buy Pringles. Under the deal, Procter & Gamble shareholders will end up owning 57% of Diamond. In addition to turning over the shares, Diamond has agreed to assume $850 million in Pringles debt.

If the company's share price is averaging more than $56.62 when the deal closes, Diamond will have to take on only $700 million in debt, according to Diamond's securities filings. But if the price falls below $44.61, it will have to take on $1.05 billion in debt.

\* \* \*

A big enough breach could give P&G room to cancel or renegotiate the sale, though analysts don't think that outcome is likely. P&G is still committed to closing the sale, a spokesman said.

34. A second WSJ article entitled, "Procter & Gamble's Diamond Loses Its Sparkle," reported that at least one of the crop payments is estimated at $50 million. Specifically, the article reported the following in relevant part:

At issue is an extra payment Diamond made to walnut farmers in September, which may have related to walnuts purchased in the previous fiscal year. The payment, estimated at $50 million based on Wall Street Journal interviews with walnut farmers, would have reduced the company's operating income by more than 50% had it been included in results for the year ended July.

If the Pringles deal crumbles, so too could Diamond's hopes of transforming from a nuts company to a high-margin snacks conglomerate. Back in 2005, nearly 70% of the company's sales were walnuts. But the company has since spent more than $800 million to acquire Pop Secret and Kettle Chips, bringing its net debt to $529 million. That compares with earnings before interest, taxes, depreciation and amortization of about $140 million last fiscal year, a figure that would have been lower including the September walnut payment.

It isn't just cash that could get tight. The company wants to use its shares as a currency to buy Pringles, but the stock would likely fall hard without a deal. Even after Wednesday's plunge, the stock trades at about 20 times

1   earnings for the year through July. Without deals to boost the top line, such a multiple looks rich.

2   35.   On this news, Diamond shares declined an additional $6.39 per share or 12% in

3   two consecutive trading sessions, to close at $46.40 per share on November 4, 2011.

4   36.   On November 5, 2011, *Barron's* published an article entitled, "Getting to the Nut

5   of the Problem." The article stated the following in relevant part:

Diamond's problems come from its legacy business as a walnut processor, which Chief Executive Michael Mendes has been hustling to push backstage via his purchases of snack brands. At the same time, walnut growers say that the company has underpaid them in recent years. Rio Oso, Calif., grower Pat Mecklenburg remembers when she realized that Diamond was turning its back on walnuts: She poured out one of the company's Emerald brand pouches of trail mix, and there was one walnut in the whole package. "Ever since Diamond came public," says Mecklenburg, "they've become less and less competitive with other handlers, until the point that it just got ridiculous."

Even after the selloff, Diamond shares look pricey. The acquisitive outfit has no tangible book value. It reported earnings for the fiscal year ended July 2011 of $2.61 a share (ignoring pesky noncash charges, like option expenses), so Diamond's multiple on those trailing earnings is a generous 18 times. And 2011 earnings were likely overstated, says Mark Roberts, whose Off Wall Street Consulting Group rang the first alarm about Diamond's nutty accounting on Sept. 25, when most of Wall Street was still cheering the company on. Had Diamond properly booked costs for fiscal 2011, Roberts estimates, it would've earned as little as $1.14 a share.

Diamond declined to talk about the walnut investigation, but a spokesman said that both Diamond and P&G remain committed to completing a Pringles deal next year, which would double the company's sales. Yet if questions arise about Diamond's "representations and warranties" as it offered its shares to P&G shareholders in exchange for the Pringles business, the deal could fall apart—or at least become much more expensive for Diamond.

Diamond's co-op members got more than half the company's stock in the IPO and signed contracts to sell their entire crop to Diamond for a term of three, five or 10 years. Happily for the farmer shareholders and all others, the stock rose steadily from its IPO price of 17. At the same time, however, many growers became unhappy with their multiyear contracts with Diamond.
Over its history, Diamond had paid growers around a third of the fall crop's estimated value within two weeks of receiving delivery, typically in November. It made another small payment in February of the following year, and the final 65% in August. Diamond ought to have booked these payments, or estimates thereof, as costs against the matching revenues from the prior fall's crop.

In good years, Diamond paid a little less than other handlers, says Jonathan Field, the general manager of the Walnut Bargaining Association, because Diamond committed to take a grower's entire crop, and because in years of weak demand, it paid a little more than the market

price. In 2008, prices tanked to about 60 cents a pound, recalls Field, but Diamond paid more than 70 cents.

With recent demand booming for walnuts as a protein-packed snack with healthy, omega-3 fatty acids, Diamond's payments for the fall 2010 crop came short of market prices. "Woefully short," says Field.

Then, in early September, Diamond sent growers something it called "a momentum payment" of 30 to 40 cents a pound. The company said the payment was for the coming 2011 crop, but farmers believe it was really a way to bring Diamond's price for their 2010 crop closer to market rates. Transaction records examined by Off Wall Street's Roberts showed that, until 2009, Diamond had called its August check the "final payment" for the prior year's crop.

This year, Diamond didn't use the word "final" on its August payment to a grower Roberts spoke with, telling the grower to expect a September "momentum payment." Believing himself underpaid, the farmer asked Diamond's head of field operations if the September payment was for the 2010 crop. According to Roberts, the Diamond executive said yes. Most puzzling, the September payments went to farmers who've ended their sales contracts with Diamond and won't be supplying it with their 2011 year crop. *Barron's* spoke with one of those growers.

Had the September payments been counted as part of Diamond's July 2011 fiscal year, Roberts thinks that the gross margin reported by the company would have shrunk to less than 20%, from about 25%—making the exchange of its shares for Pringles less appetizing for P&G shareholders.

37. On this news, the stock fell an additional $7.31 per share or nearly 16%, to close at $39.09 per share on November 7, 2011.

## CLASS ACTION ALLEGATIONS

38. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf a Class of all persons who purchased or acquired Diamond securities during the Class Period (the "Class"). Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

39. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Diamond securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class

CLASS ACTION COMPLAINT                                                                11

1 may be identified from records maintained by Diamond or its transfer agent and may be notified

2 of the pendency of this action by mail, using the form of notice similar to that customarily used

3 in securities class actions.

4     40.     Plaintiff's claims are typical of the claims of the members of the Class as all

5 members of the Class are similarly affected by Defendants' wrongful conduct in violation of

6 federal law that is complained of herein.

7     41.     Plaintiff will fairly and adequately protect the interests of the members of the

8 Class and has retained counsel competent and experienced in class and securities litigation.

9 Plaintiff has no interests antagonistic to or in conflict with those of the Class.

10     42.     Common questions of law and fact exist as to all members of the Class and

11 predominate over any questions solely affecting individual members of the Class. Among the

12 questions of law and fact common to the Class are:

13           •    whether the federal securities laws were violated by Defendants' acts as

14                alleged herein;

15           •    whether statements made by Defendants to the investing public during

16                the Class Period misrepresented material facts about the business,

17                operations and management of Diamond;

18           •    whether the Individual Defendants caused Diamond to issue false and

19                misleading financial statements during the Class Period;

20           •    whether Defendants acted knowingly or recklessly in issuing false and

21                misleading financial statements;

22           •    whether the prices of Diamond securities during the Class Period were

23                artificially inflated because of the Defendants' conduct complained of

24                herein; and

25           •    whether the members of the Class have sustained damages and, if so,

26                what is the proper measure of damages.

27     43.     A class action is superior to all other available methods for the fair and efficient

28 adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

1  the damages suffered by individual Class members may be relatively small, the expense and
2  burden of individual litigation make it impossible for members of the Class to individually
3  redress the wrongs done to them. There will be no difficulty in the management of this action
4  as a class action.

5      44.    Plaintiff will rely, in part, upon the presumption of reliance established by the
6  fraud-on-the-market doctrine in that:

7            •    Defendants made public misrepresentations or failed to disclose material
8                facts during the Class Period;

9            •    the omissions and misrepresentations were material;

10           •    Diamond securities are traded in efficient markets;

11           •    the Company's shares were liquid and traded with moderate to heavy
12               volume during the Class Period;

13           •    the Company traded on the NASDAQ, and was covered by multiple
14               analysts;

15           •    the misrepresentations and omissions alleged would tend to induce a
16               reasonable investor to misjudge the value of the Company's securities;
17               and

18           •    Plaintiff and members of the Class purchased and/or sold Diamond
19               securities between the time the Defendants failed to disclose or
20               misrepresented material facts and the time the true facts were disclosed,
21               without knowledge of the omitted or misrepresented facts.

22     45.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a
23 presumption of reliance upon the integrity of the market.

24

25

26

27

28

CLASS ACTION COMPLAINT                              13

## CLAIMS FOR RELIEF

### COUNT I

**(Against All Defendants For Violations of Section 10(b)
And Rule 10b-5 Promulgated Thereunder)**

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Diamond securities; and (iii) cause Plaintiff and other members of the Class to purchase Diamond securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

49.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Diamond securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Diamond's finances and business prospects.

1    50.    By virtue of their positions at Diamond, Defendants had actual knowledge of the
2    materially false and misleading statements and material omissions alleged herein and intended
3    thereby to deceive Plaintiff and the other members of the Class, or, in the alternative,
4    Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain
5    and disclose such facts as would reveal the materially false and misleading nature of the
6    statements made, although such facts were readily available to Defendants. Said acts and
7    omissions of Defendants were committed willfully or with reckless disregard for the truth. In
8    addition, each defendant knew or recklessly disregarded that material facts were being
9    misrepresented or omitted as described above.

10    51.    Defendants were personally motivated to make false statements and omit
11    material information necessary to make the statements not misleading in order to personally
12    benefit from the sale of Diamond securities from their personal portfolios.

13    52.    Information showing that Defendants acted knowingly or with reckless disregard
14    for the truth is peculiarly within Defendants' knowledge and control. As the senior managers
15    and/or directors of Diamond, the Individual Defendants had knowledge of the details of
16    Diamond internal affairs.

17    53.    The Individual Defendants are liable both directly and indirectly for the wrongs
18    complained of herein. Because of their positions of control and authority, the Individual
19    Defendants were able to and did, directly or indirectly, control the content of the statements of
20    Diamond. As officers and/or directors of a publicly-held company, the Individual Defendants
21    had a duty to disseminate timely, accurate, and truthful information with respect to Diamond's
22    businesses, operations, future financial condition and future prospects. As a result of the
23    dissemination of the aforementioned false and misleading reports, releases and public
24    statements, the market price of Diamond securities was artificially inflated throughout the Class
25    Period. In ignorance of the adverse facts concerning Diamond's business and financial
26    condition which were concealed by Defendants, Plaintiff and the other members of the Class
27    purchased Diamond securities at artificially inflated prices and relied upon the price of the
28

CLASS ACTION COMPLAINT                                                                                    15

1 │ securities, the integrity of the market for the securities, and/or upon statements disseminated by
2 │ Defendants and were damaged thereby.

3 │     54.     During the Class Period, Diamond securities were traded on an active and
4 │ efficient market. Plaintiff and the other members of the Class, relying on the materially false
5 │ and misleading statements described herein, which the Defendants made, issued or caused to be
6 │ disseminated, or relying upon the integrity of the market, purchased shares of Diamond
7 │ securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the
8 │ other members of the Class known the truth, they would not have purchased said shares, or
9 │ would not have purchased them at the inflated prices that were paid. At the time of the
10 │ purchases by Plaintiff and the Class, the true value of Diamond securities were substantially
11 │ lower than the prices paid by Plaintiff and the other members of the Class. The market price of
12 │ Diamond securities declined sharply upon public disclosure of the facts alleged herein to the
13 │ injury of Plaintiff and Class members.

14 │     55.     By reason of the conduct alleged herein, Defendants knowingly or recklessly,
15 │ directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5
16 │ promulgated thereunder.

17 │     56.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and
18 │ the other members of the Class suffered damages in connection with their respective purchases
19 │ and sales of the Company's securities during the Class Period.

20 │ **COUNT II**

21 │ **(Against The Individual Defendants for**
22 │ **Violations of Section 20(a) of the Exchange Act)**

23 │     57.     Plaintiff repeats and realleges each and every allegation contained in the
24 │ foregoing paragraphs as if fully set forth herein.

25 │     (a)     During the Class Period, the Individual Defendants participated in the
26 │ operation and management of Diamond, and conducted and participated, directly and indirectly,
27 │ in the conduct of Diamond's business affairs. Because of their senior positions, they knew the
28 │

CLASS ACTION COMPLAINT      16

1 | adverse non-public information about Diamond's misstatement of income and expenses and
2 | false financial statements.

3 |     (b)    As officers and/or directors of a publicly owned company, the Individual
4 | Defendants had a duty to disseminate accurate and truthful information with respect to
5 | Diamond's financial condition and results of operations, and to promptly correct any public
6 | statements issued by Diamond which had become materially false or misleading.

7 |     (c)    Because of their positions of control and authority as senior officers, the
8 | Individual Defendants were able to, and did, control the contents of the various reports, press
9 | releases and public filings which Diamond disseminated in the marketplace during the Class
10 | Period concerning Diamond's results of operations. Throughout the Class Period, the
11 | Individual Defendants exercised their power and authority to cause Diamond to engage in the
12 | wrongful acts complained of herein. The Individual Defendants therefore were "controlling
13 | persons" of Diamond within the meaning of Section 20(a) of the Exchange Act. In this
14 | capacity, they participated in the unlawful conduct alleged which artificially inflated the market
15 | price of Diamond securities.

16 | 58.    Each of the Individual Defendants, therefore, acted as a controlling person of
17 | Diamond. By reason of their senior management positions and/or being directors of Diamond,
18 | each of the Individual Defendants had the power to direct the actions of, and exercised the same
19 | to cause Diamond to engage in the unlawful acts and conduct complained of herein. Each of the
20 | Individual Defendants exercised control over the general operations of Diamond and possessed
21 | the power to control the specific activities which comprise the primary violations about which
22 | Plaintiff and the other members of the Class complain.

23 | 59.    By reason of the above conduct, the Individual Defendants are liable pursuant to
24 | Section 20(a) of the Exchange Act for the violations committed by Diamond.

25 | **PRAYER FOR RELIEF**

26 | WHEREFORE, Plaintiff demands judgment against Defendants as follows:

27

28

CLASS ACTION COMPLAINT | 17

1     A.     Determining that the instant action may be maintained as a class action under

2 Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class

3 representative;

4     B.     Awarding compensatory damages in favor of Plaintiff and the other class

5 members against all Defendants, jointly and severally, for all damages sustained as a result of

6 Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

7     C.     Awarding Plaintiff and the other members of the Class prejudgment and post-

8 judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

9     D.     Awarding rescissionary damages; and

10     E.     Awarding such equitable, injunctive or other relief as this Court may deem just

11 and proper.

## DEMAND FOR TRIAL BY JURY

13     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

14 trial by jury of all issues that may be so tried.

15 Dated: November 7, 2011          **BERMAN DEVALERIO**

By: _____
Daniel E. Barenbaum

Joseph J. Tabacco, Jr.
Anthony D. Phillips
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6282
Email: jtabacco@bermandevalerio.com
     dbarenbaum@bermandevalerio.com
     aphillips@bermandevalerio.com

Marc I. Gross
Jeremy A. Lieberman
**POMERANTZ HAUDEK**
**GROSSMAN & GROSS LLP**
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: migross@pomlaw.com
     jalieberman@pomlaw.com

CLASS ACTION COMPLAINT          18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Patrick V. Dahlstrom
**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Counsel for Plaintiff*

## Certification of Plaintiff
## Pursuant to Federal Securities Laws

1.  I, Richard Mitchem, make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D (a) (2) of Title 1 of the Securities Exchange Act of 1934.

2.  I have reviewed a Complaint against Diamond Foods, ("Diamond Foods"), and authorize a filing of a comparable complaint on my behalf.

3.  I did not purchase my Diamond Foods securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title 1 of the Securities Exchange Act of 1934.

4.  I am willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my purchases and sales in Diamond Foods securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8.  The matters stated in this declaration are true to the best of my current knowledge, information and belief.

I declare under penalty or perjury that the foregoing is true and correct.

Executed __Nov 7, 2011__, at __Warr Acres, Ok__
       (Date)                        (City, State)

_Richard A. Mitchem_
                    (Signature)

Richard A. Mitchem
                 (Type or Print Name)

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 9/21/11 | Purchase | 222 | $90.00 |
| 11/2/11 | Sale | 222 | $50.22 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |